Good afternoon. If it pleases the Court, on behalf of Ayala, the petitioner, Baris Serene. Can I say something, Mr. Serene? I've only said this once before in 10 years on the bench, but your brief is almost unreadable, just formatting-wise. I don't understand why it wasn't kicked, but really I couldn't read it. Everything is in bold, every date is undermined, there's all sorts of capitalizations for no reason, the formatting doesn't make any sense. It is really, it was literally impossible for me. I hope that you will disamend more briefs that look like this. I apologize, Your Honor. Thank you. Your Honor, you have basically the immigration judge who granted my client cat relief, and that evidence was never, ever, ever rebutted. I'm sorry, I didn't hear that. My client was granted cat relief originally by the immigration judge, based on the evidence of testimony from Mr. Rivera. Mr. Rivera's testimony was never, ever rebutted. It was submitted, and it was accepted by the immigration judge, and it's on page 12 of her decision, on the transcript, on 00471. Well, then the BIA, then the government appealed, and the BIA reversed, right? The government appealed, and it was sent back for the judge to qualify, because they felt she shouldn't have relied on the mental retardation or the mental health problems of my client. They felt that had no basis for a cat claim. But at no time was Mr. Rivera's testimony or facts disputed. When it went back, we had an expert, a gang expert, and I don't know if it's the same gang expert who was in the other case, Mr. Rodriguez, who provided a written report and oral testimony, which was accepted. The judge never questioned the conclusions of the expert and felt he was a gang expert. He did qualify, and he did state that U.S. deportees such as my client, if they're sent back, will be tortured, killed, or kidnapped by vigilantes or other street gangs at the acquiescence of the Salvadorian government. He also quoted in Mr. Ayala, like my client, who was a U.S. deportee who was thrown into a well and died four days later. You have the same problem again, which is this more than 50 percent standard. How do you meet that? Mr. Rodriguez stated probability as compared to possibility. In his opinion, he gave an expert opinion, which the judge accepted his qualifications as an expert, that my client would be tortured if he was returned as a U.S. deportee. Nothing to do with his gangs. As a U.S. deportee to El Salvador in a social cleansing program where he would be kidnapped or killed. He has done research. He has spoken to 30 such U.S. deportee families who have disappeared, either been tortured or killed in El Salvador. And those weren't refuted. There was nothing on his report that was refuted, except when the judge rendered her decision. She made allegations. She didn't accept that. She never ever questioned him. We felt that was a due process issue because he should have been given an opportunity to respond. He does respond in the in in my BIA brief where I provided his statement and the BIA did not strike it. It's part of the record where he states the basis of his findings and why he came to those findings. Those findings have not been refuted. Neither has Mr. Rivera's findings been refuted, nor have any of the other evidence. But there, if I may, there was a extremely, a relatively rigorous I.J. opinion on remand. She didn't ignore the Rodriguez testimony. She dealt with it. And absent some, in some of these other cases, we seem to have a standard that's being applied wrong or evidence that's just being entirely ignored. And here, he's, it's not being ignored. He talked about Rodriguez. He talked about why he chose not to regard it as dispositive. So what, the fact that he had a different view the first time, why does that matter? Because she didn't disregard, so she, Judge Sidgraves is the lady. She did not disregard Mr. Rivera's testimony, which was the basis of her claim. She disregarded or had problems, as you've clearly stated, on Mr. Rodriguez's testimony as a gang expert. All we're saying is she never provided him an opportunity to respond. She felt his testimony was as an expert, and she stated she believed he was an expert. But Mr. Rivera, the basis of her claim, which I've stated on, is on page 12 of her decision on transcript 00471. She came to the conclusion that my client will be tortured, and there is a death squad to torture and kill people such as him in El Salvador. And that's why she gave him cat relief. The other two individuals who did testify, which was the reason for the remand, dealt with his mental retardation and having no social family in El Salvador, which the BIA felt was irrelevant for the claim. So if the basis of her original claim was based on Mr. Rivera's testimony, she has never, ever distinguished that. Well, she actually, her original determination seemed to be largely based on Dr. Diaz's testimony. And taking, in fact, in the whole analysis discussion, she doesn't talk about Rivera. The first opinion, I mean. She talks about Diaz and Echavar. And she, and that had a lot to do with his mental status issue. And you don't really challenge the, you're not challenging in court the notion that his mental status was irrelevant. We didn't raise it, we didn't discuss it, because that wasn't an issue for us to discuss. The issue for us to discuss was, was he going to be tortured if he was being returned, going by the BIA decision. We did not discuss his mental status. And you're not taking the position that his mental, in this court at this point, that his mental status is relevant to that determination. Even though there was some testimony that it would be relevant to that determination. That is correct. But you're not taking that position now. You've said nothing about it in your brief. We have never mentioned it, neither did Dr., did Mr. Rodriguez mention it or Mr. Rivera. I slightly disagree with you that I believe she relied heavily on Mr. Rivera's on page 11 and 12 of her decision in granting. All she's doing on page 11 and 12 is saying what he said. That's correct. Where he stated, and the reasons where he's stating there is a death squad to kill people such as him affiliated, which is the basis of her. And she goes on that the military police and the government sanctions the death squads. But that is not a statement of fact. It is a statement of what Mr. Rivera said. It's not a finding of fact. And the conclusion is on page 13. If he is deported, he will be killed or hurt in El Salvador. I'm sorry to disagree, Mr. Sarrish, but it is not a statement of fact, a conclusion of fact. It is a statement of what Mr. Rivera believes. And she accepted that. All I'm just stating is your honor. Where do you get that from? On page 13, it just goes on and on to state that the responder will have to go to a special school. If he's deported, he will be killed or hurt in El Salvador. It's solely based on Mr. Rivera. And if she's coming to those conclusions, she never ever distinguished those conclusions. But if this Court believes that Mr. Rivera and Mr. Rodriguez, I think Mr. Rodriguez added more facts, provided more documentation. There was no documentation to refute the documentation he provided by the government. And there was no opinions provided by the government to refute his opinions. And the opinions of Mr. Rodriguez are very clear that my client will be tortured, killed or kidnapped if he's returned to El Salvador. Thank you. If you may raise your right hand. Thank you. Good afternoon. I'm Ann Wilhuff, a respondent, United States Attorney General Holder. May it please the Court. Your Honor, this case, as you noted, is the last in a series of cases dealing with CAT and El Salvadoran gang cases. And I really believe that the last case is the best one was saved for last because Petitioner, what Petitioner wants to say. We waited until all the other AGs got out. I believe factually this is the best and most solid cases. I did read the other opinions. We did discuss the cases. And this case is clearly a factual determination by the agency based on a very thorough examination of a voluminous record, an excellent record. And the immigration judge in this case clearly considered and weighed all the evidence. Well, why didn't she consider the two experts' testimony in particular? Well, Your Honor, I do believe she, in fact, considered it and weighed it and placed a different amount of weight on it than Petitioner would have liked. But that doesn't mean that she didn't weigh it. And, in fact, I would point the Court out to administrative record at page 135. This is when Dr. or Mr. Rodriguez, this is really the sum total of his opinion on why this petitioner faces fear. He says this. Basically, this is his whole case. I think he'll likely be hurt, threatened, or possibly killed by either the Mara Salvatrucha 13 or MS-18 gang members or the National Police or death squad. They're active, although their numbers have greatly decreased. The word I hear from people is they're still in El Salvador. The immigration judge weighed that and didn't place the weight on it that Petitioner would want. There's certainly evidence in this record that it's possible that there are some incidents or that there has been incidents of police involvement in extrajudicial killings or deaths. But there's evidence that that has occurred. That doesn't make the evidence more likely than not that that is what will happen to Petitioner. In fact, at one point, the Petitioner's attorney asked Mr. Rodriguez to quantify. We talked a lot about quantifying the possibilities this morning because that's what we do when we're looking at CAT. And we try to decide, is it more likely than not? Mr. Rodriguez was asked, can you please quantify it? And again, at administrative record at page 135, he says, you know, that's really hard to do. He uses those words. That would be hard to quantify, he says. But there's a really high crime rate in El Salvador, really high crime rate. So I'd say at least a 50 percent chance. There may be a high crime rate in El Salvador. That doesn't mean that there's a 50 percent or greater chance that this Petitioner is going to be tortured or killed. Certainly, you know, not because of his gang tattoos. Maybe he'll be a victim of random crime. How about the other expert? Well, again, I think that the medical expert, the forensic, I think he was a forensic psychologist. No. Mr. Riaz? Again, I think that the immigration judge in a very thorough 15, 16-page, single-spaced, detailed opinion recounts the stuff and summarizes the testimony of each witness. The immigration judge summarizes pertinent points from much of the documentary evidence. And she provides a very thoughtful analysis on her weighing of that evidence. What evidence was there that contradicted the evidence that Petitioner presented, other than you're saying it wasn't internally strong? But what other evidence was there? Well, the evidence is overwhelmingly clear that the El Salvadoran government is attempting to eradicate and deal with in a proper, lawful way the gang violence. I would say that there are two. I have, I think, two comments. One of them is Petitioner does not seem to be taking the side. But, frankly, I don't understand the first PIA ruling that his mental state was totally irrelevant. It doesn't seem to me to be totally irrelevant to a determination of how likely he is to be tortured if he comes to the attention of the government because of his gang tattoos, because somebody who was mentally challenged, it seems, is more likely to give, to be singled out. And there was testimony to that degree. So I don't think that, in other words, I don't think that his mental, obviously, his mental standard situation is not the reason that he would be singled out, but it might have something to do with his likelihood of being tortured. It's like the eggshell plaintiff thing. Essentially. And it would be relevant here, but I see no argument. And there isn't, hasn't been. That was, in fact, the BIA's first opinion. And we are not looking at that opinion in this proceeding. We're not looking at it. We could be looking at it because it's actually never come here. But it hasn't been argued here. And the second thing that gives me cause that doesn't, but I think it's not reflected in the BIA opinion, it's reflected in the IJ opinion, and you can tell me whether you think that's right, is the very last paragraph of the IJ opinion, which seems to say that criminal gang members can't partake of the Convention Against Torture even if they're more likely than not to be tortured. And that seems statutorily wrong. Your Honor, that's an excellent point. And what I would say is with respect to that sentence, I believe that the immigration judge, I don't believe that that is an accurate statement. I think we have the edu case from this Court that makes it clear that it doesn't matter how bad the act or a cat reaches out to everyone. And I don't think that statement is correct. However, the avalanche of evidence in this case and the thorough, thoughtful analysis that preceded that one sentence that I would almost characterize as sort of venting at the end, I don't think is overshadowed by that sentence. I don't agree with it. I agree with you. Because the BIA in discussing Artiego was discussing it as an evidentiary matter. Exactly. Because, yeah, I really did look at that and I thought is the BIA picking up on that thought because I wouldn't have agreed with that. And I don't think they were. The BIA is picking up on the conflicting evidence portion of Artiego and is saying just like in Artiego, what we have here is a whole lot of evidence. There certainly is evidence in this record, and you'll see when you look at the evidence. There's evidence that extrajudicial killings where the police have been complicit have occurred. And there's evidence that the police don't provide the necessary protection. There is some evidence of that. But the evidence, there's also a lot of evidence that the government is taking a very hard line approach to combating gang violence and wiping that out. And there are cases of overzealousness. Those are documented in the documents in this case. I think the word that's used in the USAID report, you'll see throughout that report the government's hard line approach. I counted how many times I read hard line approach, and it was numerous. But one thing that's sort of mysterious and disturbing that I don't know what is to be done about is one of your predecessors, I think, stated this, that we have three El Salvador cases. We have different records in them, and how people are fair can depend both on how the record is handled, but also what's in the record. And so there's no consistency even with regard to the same time period and the same claims. It's just a question of what the lawyers have put on. And also what different IJs, for example, choose to credit or don't choose to credit. But I gather that's the way this world works. Well, I think there is in the cases some common evidence with the El Salvador case. I know the very last case did have the same expert. Dr. Rodriguez was the same person. I believe that had the Harvard report in it, and I'm not sure about the USAID report. Both had country reports, although I think my case had a later year. One was 2005, one was 2006. They're fairly similar. I think there's some similar evidence, but I think the common thread in the El Salvador cases here is that I think in agency recognition that there is some evidence that there is overzealousness by police or efforts to perhaps not prevent and let the gangs. But that's why you would think that something that distinguishes the particular petitioner, like this person's mental state, would matter. But I'm just ranting because it's not really. It's not in front of the court. That's correct, Your Honor. But I think that the common thread is that there is evidence that it's a possibility, but all the cases came down with, the evidence didn't say it was more likely than not. That is not what was drawn from the evidence. And I believe that substantial evidence, certainly in my case, they have pointed to nothing. Well, would you agree that if the person is mentally deficient, there's some reason to consider that as increasing the probability? That should be considered by the board. Whether it's determinative, I don't know, but shouldn't that be considered? Well, the agency on the first appeal took the position. The agency opined that that was not relevant to the torture claim. And as we've discussed, that's not in front of the court. Do I believe that? Honestly, I don't think that I want to comment on the propriety of the board's ruling in that regard. Well, should we reverse the board on that? I'd be more comfortable after doing a little bit of research. I know that the board, that was the position they took. And the propriety of that position is not in front of the court today. You don't have to speak forever, but you're a sensible person. You're willing to say there could be instances where a person is. That's all it is. It seems to me it increases the ---- Well, I found that to be an interesting aspect of this case as well, Your Honor, when I looked at it. There was testimony that that was true. Yes, there was. And because of his diminished mental capacity. And I was curious as to why that wasn't pursued. But it was not. And I can't comment on the propriety of that. I'm fairly happy it's not in front of the court today. Okay. Thank you very much, and again, really a useful argument. Thank you, Your Honor. Thank you. Thank you, Your Honor. Mr. Sarah. Judge Noonan, your question wasn't ever addressed by counsel. Nowhere was Mr. Rivera's adequate responses to show cat relief ever rebutted by the immigration judge or by any evidence in the record. The evidence in the record clearly shows with all the reports that social cleansing is what counsel is talking about that will result in my client's torture is how they deal with gang members being deported. And that was the evidence that has never been rebutted by anything. As far as my client's mental capacity, once the BIA ruled and remanded it back and stated that is not to be considered, we considered to deal with the sole issue, and the sole issue that we were dealing with was based on the board's basically objective is to deal with the cat claim regarding the 50 percent and the social cleansing movement and whether my client would be kidnapped, killed, or tortured if he returned, and we proved that. Thank you. All right. Thank you very much. Thank both of you for a useful argument in Aelia v. Holder, which was submitted, and we are in recess until tomorrow night. Thank you. All right. Is there a conference? What's that? Do you need anything else to prepare for a conference? No, I'm fine. I guess I'm just going to rearrange this stuff. Devin says she thinks there's tape. All right. Be careful. All right.
judges: Noonan, Berzon, Callahan